# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

--------------------------------------------------------

| | |
|---|---|
| SIVARAMAN PILLAI, Individually and on | : |
| Behalf of All Others Similarly Situated, | : |
| 19 Crumlin Cres | :   Civil Action No. _____ |
| Brampton, ON, L6X OY4, Canada | : |
| | : |
|         Plaintiff, | :   **CLASS ACTION COMPLAINT FOR** |
| | :   **VIOLATIONS OF SECTIONS 14(a)** |
| v. | :   **AND 20(a) OF THE SECURITIES** |
| | :   **EXCHANGE ACT OF 1934** |
| GENVEC, INC. | : |
| SERVE ON: | :   **JURY TRIAL DEMAND** |
| Douglas J. Swirsky | : |
| 910 Clopper Road, Suite 220N | : |
| Gaithersburg, MD 20878 | : |
| (Montgomery County) | : |
| | : |
| WAYNE T. HOCKMEYER | : |
| c/o GenVec, Inc. | : |
| 910 Clopper Road, Suite 220N | : |
| Gaithersburg, MD 20878 | : |
| (Montgomery County) | : |
| | : |
| WILLIAM N. KELLEY | : |
| c/o GenVec, Inc. | : |
| 910 Clopper Road, Suite 220N | : |
| Gaithersburg, MD 20878 | : |
| (Montgomery County) | : |
| | : |
| STEFAN D. LOREN | : |
| 910 Clopper Road, Suite 220N | : |
| Gaithersburg, MD 20878 | : |
| (Montgomery County) | : |
| | : |
| QUINTEROL J. MALLETTE | : |
| c/o GenVec, Inc. | : |
| 12111 Parklawn Drive | : |
| Rockville, MD 20852 | : |
| | : |
| MICHAEL RICHMAN | : |
| c/o GenVec, Inc. | : |
| 12111 Parklawn Drive | : |
| Rockville, MD 20852 | : |

MARC R. SCHNEEBAUM                          :
910 Clopper Road, Suite 220N                :
Gaithersburg, MD 20878                      :
(Montgomery County)                         :
                                            :
and                                         :
                                            :
DOUGLAS J. SWIRSKY                          :
910 Clopper Road, Suite 220N                :
Gaithersburg, MD 20878                      :
(Montgomery County)                         :
                                            :
                                            :
            Defendants.                     :
-----------------------------------------------------------

Plaintiff Sivaraman Pillai ("Plaintiff"), by and through his attorneys, alleges upon

personal knowledge as to himself, and upon information and belief based upon, among other

things, the investigation of counsel as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1.      This is a shareholder class action brought by Plaintiff, on behalf of himself and

other holders of the common stock of GenVec, Inc. ("GenVec" or the "Company") against

GenVec and GenVec's Board of Directors (the "Individual Defendants" or the "Board"), for

their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a), and Rules and Regulations promulgated

thereunder, including Rule 14a-9, 17 C.F.R. §240.14a-9, and SEC Regulation G, 17 C.F.R.

§244.100, in connection with the proposed merger between GenVec and Intrexon Corporation

("Intrexon"), through Intrexon GV Holding, Inc.. ("Merger Sub") (collectively, "Intrexon").

2.      GenVec is a clinical-stage biopharmaceutical company with an entrepreneurial

focus on leveraging its AdenoVerse gene delivery platform to develop a pipeline of cutting-edge

therapeutics and vaccines. The Company is a pioneer in the design, testing and manufacture of adenovectored product candidates that can deliver on the promise of gene-based medicine.

3.       On January 24, 2017, Defendants announced that they had entered into a definitive agreement under which GenVec stockholders will receive 0.297 of a share of Intrexon common stock in exchange for each share of GenVec common stock. This exchange ratio represents $7.00 per share of GenVec's common stock based on Intrexon's 5-day volume weighted average price as of January 23, 2017.  GenVec stockholders will also receive a right to contingent consideration equal to 50% of any milestone or royalty payments received within 36 months after the closing of the transaction under GenVec's Research Collaboration and License Agreement with Novartis ("License Agreement").  Pursuant to the Agreement and Plan of Merger, dated December 12, 2016 (the "Merger Agreement"), Merger Sub will merge with and into GenVec, with GenVec surviving as a wholly-owned subsidiary of Intrexon (the "Proposed Transaction").

4.       Based on Intrexon's stock closing price of $22.09 on January 23, 2017, the last trading day prior to the public announcement of the Proposed Transaction, the implied value of the merger consideration (not including any payments with respect to any contingent payment rights) was $6.56 per share. However, since that time, Intrexon's stock price has fallen, closing as low as $18.93 on March 23, 2017, which represents an implied merger consideration value of only $5.62 per share. That same day, the Company's stock price closed at $6.00 per share, representing a $0.38 per share premium to the implied merger consideration. The Board failed to negotiate for a collar that would protect GenVec's stockholders from this foreseeable decline in Intrexon's stock price.

5.      To induce stockholders to vote in favor of the Proposed Transaction, on March 17, 2016, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, Defendants filed, or caused to be filed, a materially false and/or misleading Registration Statement on Form S-4, which was amended on April 21, 2017 (collectively, the "Registration Statement") with the U.S. Securities and Exchange Commission (the "SEC"). Among other things, the Registration Statement contains the unanimous recommendation of the Board that GenVec shareholders vote "for" the proposal to adopt the Merger Agreement. However, the Proxy misrepresents and omits material information.

6.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

8.      Venue is proper pursuant to 28 U.S.C. §1391(b) because Defendants systematically conduct business on a regular basis in this District and/or reside in this District, and a substantial part of the events and omissions complained of herein occurred in this District.

## PARTIES AND RELEVANT NON-PARTIES

9.      Plaintiff is, and was at all times relevant hereto, a continuous stockholder of GenVec.

10.      Defendant GenVec is a Delaware corporation, with its principal place of business at 910 Clopper Road, Suite 220N, Gaithersburg, MD 20878.

11.      Defendant Wayne T. Hockmeyer ("Hockmeyer") has served as a director of GenVec since December 2000.  Defendant Hockmeyer is a member of the Nominating and

Corporate Governance Committee, is the Chair of the Compensation Committee, and served as Chairman of the Board from November 2013 until October 2016.

12.     Defendant William N. Kelley ("Kelley") has served as a director of GenVec since June 2002.  Defendant Kelley is Chair of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

13.     Defendant Stefan D. Loren ("Loren") has served as a director of GenVec since September 2013.  Defendant Loren is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

14.     Defendant Quinterol J. Mallette ("Mallette") has served as a director of GenVec since October 2014.  Defendant Mallette is a member of the Audit Committee.

15.     Defendant Michael Richman ("Richman") is a director of GenVec. Defendant Richman has served as Chairman of the Board since October 20, 2016.

16.     Defendant Marc R. Schneebaum ("Schneebaum") has served as a director of GenVec since April 2007.  Defendant Schneebaum is a member of the Compensation Committee and the Chair of the Audit Committee.

17.     Defendant Douglas J. Swirsky ("Swirsky") has served as a director, President, and Chief Executive Officer ("CEO") of GenVec since September 2013.

18.     Defendants Hockmeyer, Kelley, Loren, Mallette, Richman, Schneebaum and Swirsky are collectively referred to herein as the "Board" or the "Individual Defendants."

19.     The Individual Defendants and GenVec are referred to as "Defendants."

20.     Non-party Intrexon is a Virginia corporation with its principal executive offices located at 20374 Seneca Parkway, Germantown, MD 20876.

21.    Non-party Intrexon GV Holdings ("Merger Sub") is a Delaware Corporation, which was formed by Intrexon solely for the purpose of acquiring GenVec and is a wholly-owned subsidiary of Intrexon. Upon completion of the merger, Merger Sub will cease to exist.

## SUBSTANTIVE ALLEGATIONS

### Background

22.    GenVec is a clinical-stage biopharmaceutical company with an entrepreneurial focus on leveraging its AdenoVerse gene delivery platform to develop a pipeline of cutting-edge therapeutics and vaccines. The Company is a pioneer in the design, testing and manufacture of adenovectored product candidates that can deliver on the promise of gene-based medicine.

23.    GenVec's lead product candidate, CGF166, is licensed to Novartis and is currently in a Phase 1/2 clinical study for the treatment of hearing loss and balance disorders.

### GenVec's Recent Financial Performance

24.    On May 12, 2016, GenVec issued a press release reporting its financial results for the quarter ended March 31, 2016, which stated that the Company ended the first quarter with $6.9 million in cash, cash equivalents, and liquid investments.

25.    Commenting on the financial results, Defendant Swirsky stated, in part, as follows:

> Our partnered pipeline continues to advance, and we expect our partner TheraBiologics to advance a second-generation neural stem cell-based cancer treatment utilizing our technology into the clinic later this year. ***Our recent financing further enables GenVec to remain focused on finding new collaborations to maximize the value of our AdenoVerse™ gene delivery platform and we are excited by the response from potential partners***.[1]

---

[1] All emphasis added unless otherwise noted.

26.     On August 5, 2016, GenVec issued a press release reporting its financial results for the quarter ended June 30, 2016, which stated that the Company ended the second quarter of 2016 with $9.6 million in cash.

27.     Commenting on the financial results, Defendant Swirsky stated, in part, as follows:

> We are pleased that the recent lift of the clinical hold on the CGF166 Phase 1/2 clinical trial by the FDA has allowed our partner Novartis to advance directly into the next patient cohort at a higher dose level. Enrollment is underway in the fourth cohort and we are excited about the product's potential to bring meaningful improvement to patients with severe to profound hearing loss. We believe the trial continues to be on track to be completed in 2017 as previously announced.
>
> On the business development front, we continue to see strong interest from potential partners in our AdenoVerse™ gene delivery platform.  Our proprietary suite of vectors may offer significant advantages for applications in emerging areas such as gene editing and cellular immunotherapy.

28.     On November 4, 2016, GenVec issued a press release reporting its financial results for the quarter ended September 30, 2016, which stated that the Company ended the third quarter of 2016 with $8.4 million in cash, cash equivalents and investments.

29.     Commenting on the financial results, Defendant Swirsky stated, in part, as follows:

> During the third quarter, the FDA lifted the clinical hold on the CGF166 Phase 1/2 clinical trial, which allowed the drug to advance into the next patient cohort at a higher dose level. Patient enrollment is currently underway in the fourth cohort and we look forward to updating our stockholders as further progress is made.
>
> Operationally, we remain focused on business development activities directed at forming new collaborations to maximize the value of our AdenoVerse™ platform. Recently presented data demonstrate the potential of our proprietary vectors to deliver genes to immune cells and we believe our platform may offer unique advantages for applications in emerging areas such as cellular immunotherapy and gene editing.

**The Proposed Transaction**

30.     On January 24, 2017, Defendants issued a press release announcing the Proposed

Transaction as follows:

> **GERMANTOWN, MD, and GAITHERSBURG, MD, Jan. 24, 2017** --
> Intrexon Corporation (NYSE: XON), a leader in the engineering and
> industrialization of biology to improve the quality of life and health of the planet,
> today announced that it has entered into a definitive agreement to acquire
> GenVec, Inc. (NASDAQ: GNVC), a clinical-stage company and pioneer in the
> development of AdenoVerse™ gene delivery technology.
>
> Intrexon intends to integrate and expand upon GenVec's expertise in adenoviral
> vectors and cGMP drug product manufacturing to enhance its broad gene transfer
> capabilities that encompass multiple viral and non-viral platforms. Notably, the
> combined technologies have the potential to yield the next generation of
> adenoviral (AdV) delivery through the creation of a scalable manufacturing
> platform utilizing helper-dependent adenovirus with significantly higher payload
> capacity of >30kb, as compared to current viral delivery methods ranging from
> 4.5kb – 9kb.
>
> Thomas D. Reed, Ph.D., Intrexon's chief science officer commented, "Our
> acquisition of GenVec will mark our continuing commitment to add gene delivery
> platforms that complement our multigenic control systems. Intrexon's proficiency
> in using various viral as well as non-viral transfer techniques to integrate our gene
> programs affords us the capability to pursue an array of *in vivo* and *ex vivo* gene
> and cell therapy approaches, and the addition of a helper-dependent adenoviral
> system with a substantial payload capacity dramatically expands the types of *in
> vivo* therapeutic programs we can pursue."
>
> "GenVec has contributed significantly to advancements in gene therapy through
> its AdenoVerse technology, and over 3,000 clinical trial subjects have received
> their therapeutics and vaccines across the globe. We are enthusiastic to begin
> working alongside their highly accomplished research and drug development
> team," added Dr. Reed.
>
> "After a detailed and careful evaluation, our board of directors believes that this is
> the best alternative to maximize value for GenVec's shareholders," said Douglas
> Swirsky, GenVec's president and CEO. "We expect that the strong scientific
> synergies, coupled with Intrexon's extensive resources, will help unlock the true
> potential of the AdenoVerse platform."
>
> Through an AdV-based vector, Intrexon has already delivered the first clinically
> validated transcriptional gene switch utilizing the RheoSwitch Therapeutic
> System® to regulate the expression and concentration of a powerful cytokine,

interleukin-12, to treat cancer. Intrexon's gene control systems combined with the array of GenVec's AdV-based technology is projected to accelerate its ability to develop cutting-edge gene therapies that regulate *in vivo* expression of multiple therapeutic effectors.

Additionally, GenVec's selection of vector origins and serotypes as well as know-how in specifying cellular and tissue targets is expected to expedite the design and production of vectors that complement Intrexon's multigene programming and focus on safety with limited off-target effect.

Douglas E. Brough, Ph.D., GenVec's chief scientific officer stated, "We are excited to be joining the talented team at Intrexon. Utilization of their advanced synthetic biology tools and expertise is expected to enable the development of a manufacturing approach that will greatly increase the capacity of our expression cassettes to over 30kb. This next-generation delivery platform is anticipated to vastly exceed other viral delivery methods and accommodate Intrexon's advanced gene programming to target complex multi-gene disorders."

**Transaction Terms and Timing**
Pursuant to the definitive agreement, upon the closing of the transaction GenVec stockholders will receive 0.297 of a share of Intrexon Common Stock in exchange for each share of GenVec common stock. This exchange ratio represents $7.00 per share of GenVec's common stock based on Intrexon's 5-day volume weighted average price as of January 23, 2017. GenVec stockholders will also receive a right to contingent consideration equal to 50% of any milestone or royalty payments received within 36 months after the closing of the transaction under GenVec's Research Collaboration and License Agreement with Novartis. Consummation of the acquisition is subject to customary closing conditions, including GenVec stockholder approval, and is expected to occur in the second quarter of 2017.

Roth Capital Partners provided advisory services to the Board of Directors of GenVec in connection with the transaction, and Hogan Lovells is serving as legal counsel to GenVec. Thompson Hine is serving as legal counsel to Intrexon.

## The Merger Agreement's Preclusive Terms and Deal Protection Provisions Favor Intrexon

31.     Compounding the harm associated with the unfair consideration, the terms of the

Merger Agreement unreasonably favor Intrexon over any other potential bidders for GenVec.

32.     To protect Intrexon's ability to secure the benefits it anticipates in the Proposed

Transaction, and to ensure that no competitive bidder will step in to reap those benefits, Intrexon

negotiated, and the Board granted, unreasonable deal protections. The Merger Agreement

contains preclusive measures, considered collectively and in context, that will hinder the emergence of a superior offer.

33.     First, GenVec and the Individual Defendants agreed to a strict "no solicitation" provision in the Merger Agreement that prohibits GenVec or the Individual Defendants from taking any actions that might lead to a better deal for GenVec stockholders.

34.     Second, the Merger Agreement grants Intrexon matching rights, including the right to be provided with confidential, non-public information concerning any competing acquisition proposal from a third party and the right to be provided with any non-public information or data provided to a possible competing bidder that was not previously made available to Intrexon, which information Intrexon then could use to prepare a matching bid. In the event of a superior offer, the Merger Agreement also automatically gives Intrexon three business days to renegotiate the terms of the Proposed Transaction.

35.     Third, the Merger Agreement also contains a highly restrictive "fiduciary out" provision permitting the Board to change its recommendation in favor of the Proposed Transaction and/or pursue a superior proposal only under extremely limited circumstances.

36.     Fourth, the Merger Agreement requires that GenVec pay Intrexon a $550,000 million termination fee in the event GenVec terminates the Merger Agreement to pursue a superior proposal.  The Company may also be required to reimburse Intrexon's expenses.

37.     The Individual Defendants agreed to these deal protection provisions, which further restrain the Company's ability to solicit or negotiate with any third party other than Intrexon concerning a possible acquisition of the Company. Given that the deal protection measures in the Merger Agreement will preclude the emergence of a superior offer, it is

imperative that GenVec shareholders received all material information necessary to assess the fairness of the Proposed Transaction.

**The Flawed Process and Material Omissions in the Registration Statement Therefrom**

38.     On May 19, 2016, Thomas Reed, Ph.D., Founder and Chief Science Officer of Intrexon, met with Defendant Swirsky to discuss a possible strategic transaction between GenVec and Intrexon.

39.     After several discussions between representatives of Intrexon and GenVec over the next months, on November 22, 2016, Intrexon sent a letter expressing interest in pursuing a strategic transaction with GenVec and requesting that the two companies negotiate an exclusivity agreement.  The Registration Statement does not disclose the terms of the proposed strategic transaction.

40.     On November 25, 2016, the Board met and authorized Swirsky to enter into the exclusivity agreement, despite not attempt to reach out to any other parties.

41.     On November 29, 2016, GenVec and Intrexon executed an exclusivity agreement, which provided that, between November 29, 2016 and January 23, 2017, GenVec would refrain from, among other things: (i) soliciting or accepting any offers for the acquisition of 20% or more of its outstanding securities or all of its assets; (ii) disclosing any non-public information to any entity with respect to such offers; or (iii) entering into any agreement relating to such offers.

42.     On December 28, 2016, GenVec received a non-binding proposal from Intrexon to acquire 100% of the issued and outstanding stock of GenVec, in a stock-for-stock transaction, at an implied price of between $3.75 and $3.85 per share.  The Board rejected the proposal.

43.     On January 20, 2017, Intrexon sent GenVec a revised proposal to acquire 100% of the issued and outstanding stock of GenVec at a price of $6.00 per share in the form of

Intrexon common stock plus a contingent payment right covering the next milestone to be received under the License Agreement.  After several counteroffers, Intrexon offered to acquire GenVec for Intrexon common stock for a value of $7.00 per share of GenVec common stock (which is a premium to the current value of the merger consideration) plus 50% of the milestone payments received under the License Agreement during the next 36 months.  Defendant Swirsky responded that the companies should move forward on negotiating the merger documents under those terms, despite that he did not communicate the proposal to, or received approval from, the Board. The Board never negotiated for a collar to protect GenVec stockholders from any foreseeable declines in Intrexon's stock price.

44.     On January 21, 2017, the Board met and determined to proceed with Intrexon's offer, despite that the Board had not retained or received advice from a financial advisor. Only after receiving advice from its legal counsel at this meeting did the Board discuss engaging a financial advisor to assess the proposed transaction with Intrexon.  The Board determined that it would only engage a financial advisor to deliver a fairness opinion, not to solicit interest from other third parties.   The Board also authorized Defendant Swirsky to engage Roth Capital Partners, LLC ("Roth") as GenVec's financial advisor to provide a fairness opinion, but the Registration Statement fails to disclose the reason the Board selected Roth and it fails to disclose the past services that Roth has provided to GenVec and Intrexon.

45.     Also at the January 21, 2017, the Board determined to create a special committee of the Board to consider the transaction, but the Registration Statement fails to disclose the reason the Board determined to form a special committee, including whether it was due to any perceived conflicts of interest.  The Registration Statement states that the Board's legal counsel "advised the GenVec board of directors of its considerations in connection with a potential

conflict of interest if Intrexon were to offer the executives of GenVec employment with Intrexon prior to the closing of the transaction with Intrexon." The Registration Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of GenVec's officers and directors, including who participated in all such communications.

46.     Without contacting any other potentially interested parties, the Board negotiated the terms of the Merger Agreement over the next three days. In the same time, Roth prepared valuation analyses that it presented to the Board on January 24, 2017, but the Registration Statement fails to disclose a fair summary of each of those analyses. After receiving Roth's opinion that the merger consideration was financially fair, the Board approved the Proposed Transaction and authorized the execution of the Merger Agreement. The Board also failed to negotiate for a "go-shop" period that would allow GenVec to solicit third party offers after executing the Merger Agreement.

**The Materially Incomplete and Misleading Registration Statement**

47.     Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction. As set forth above and below, the Registration Statement omits material information regarding the Proposed Transaction.

48.     The Registration Statement omits material information regarding GenVec's financial projections and the financial analyses performed by the Company's financial advisor, Roth, in support of its fairness opinion. With respect to Roth's Discounted Cash Flow Analysis, the Registration Statement fails to disclose the definition of "unlevered free cash flow", which is particularly important because it appears that Roth and/or GenVec management did not use the generally accepted definition to calculate GenVec's unlevered free cash flows.

49.     Although the Registration Statement purports to show the risk adjusted "cash flows" of GenVec's CGF166 and FMD programs, it fails to disclose the Company's standalone unlevered free cash flow projections and the line items used to calculate those projections.

50.     The Registration Statement fails to disclose Roth's basis for calculating terminal values based on declining cash flow at a rate of 3.0% to 7.0%.

51.     According to the Company's most recent Form 10-K filed with the SEC on March 6, 2017, the Company has net operating loss ("NOL") carryforwards of approximately $253.0 million for U.S. federal income tax purposes available to offset future taxable income and U.S. federal and state research and development tax credits of $7.5 million. The Registration Statement fails to disclose whether Roth valued these NOLs and tax credits or incorporated them into its valuation analyses and, if so, the Registration Statement fails to quantify these NOLs and tax credits. If Roth did not, the Registration Statement should provide stockholders with an explanation for Roth's failure to do so.

52.     Further, the Registration Statement indicates that, although the Registration Statement describes summaries of certain analyses performed by Roth, "they are not a comprehensive description of all analyses and examinations actually conducted by Roth."  Fair summaries of each of the valuation analyses that Roth performed in connection with its engagement by GenVec must be provided.

53.     With respect to the Company's financial projections, the Registration Statement fails to provide a reconciliation of all non-GAAP to GAAP financial metrics.  Defendants admit in the Registration Statement that "Non-GAAP financial measures should not be considered a substitute for, or superior to, financial measures determined or calculated in accordance with GAAP," yet they failed to provide stockholders with those GAAP measures.

54.     When a company discloses information in a Proxy that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information.  17 C.F.R. § 244.100.

55.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Defendants have included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.

56.     In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heighted its scrutiny of the use of such projections.[2]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance

---

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[3]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.

57.     The above-referenced line item projections that have been omitted from the Proxy are precisely the types of "reconciling metrics" that the SEC has recently indicated should be disclosed to render non-GAAP financial projections not misleading to shareholders.

58.     In order to make the non-GAAP projections on page 70 of the Proxy not misleading, Defendants must disclose a reconciliation table of the non-GAAP projections to the most directly comparable GAAP measure(s).

59.     Further, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

60.     The Registration Statement also omits material information regarding potential conflicts of interest of Roth.

61.     For example, although the Registration Statement indicates that "Roth in the past has provided and may in the future provide investment banking and other financial services to

---

[3] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017),
https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

GenVec and its affiliates for which Roth and its affiliates have received, or, in the case of future services, may receive, compensation," it fails to disclose the specific nature and timing of those services, as well as the compensation earned in connection with those past services.

62.     Additionally, the Registration Statement completely fails to disclose whether Roth has provided any services to Intrexon or any of its affiliates in the past and, if so, the nature, timing, and compensation earned for those services.

63.     Full disclosure of investment banker compensation and all potential conflicts is required.

64.     The Registration Statement also omits material information regarding potential conflicts of interest of the Company's officers and directors.

65.     The Registration Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of GenVec's officers and directors, including who participated in all such communications.

66.     Specifically, the Registration Statement indicates that "GenVec's directors and executive officers may have interests in the merger that are different from, or in addition to, the interests of shareholders," including "potential continued employment of executive officers following the merger."  Further, the Registration Statement states that, on January 21, 2017, the Board's legal counsel "advised the GenVec board of directors of its considerations in connection with a potential conflict of interest if Intrexon were to offer the executives of GenVec employment with Intrexon prior to the closing of the transaction with Intrexon." Additionally, on January 22, 2017, the special committee met and discussed Intrexon's proposed merger agreement, including provisions with respect to "employment matters."

67.     In the press release announcing the Proposed Transaction, GenVec's chief

scientific officer, Douglas E. Brough, Ph.D., stated: "We are excited to be joining the talented team at Intrexon."

68.     Despite these indications that Intrexon will retain certain members of Company management following the close of the Proposed Transaction, the Registration Statement fails to disclose the nature and timing of these conversations, as well as the amount of compensation that GenVec's retained employees expect to earn.

69.     The Registration Statement indicates that, on January 21, 2017, the Board determined to create a special committee of the Board to "consider the terms of and negotiate the Intrexon transaction," but it fails to disclose the reason the Board deemed it necessary to form a special committee, including whether it was due to any perceived conflicts of interest.

70.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is particularly material here in light of the fact that Company management lowered the Company's financial projections during the negotiations over the economic terms of the Proposed Transaction.

71.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to GenVec's stockholders.

72.     Accordingly, Plaintiff seeks enjoinment of the Proposed Transaction.

73.      Based on the foregoing, GenVec's stockholders lack critical information necessary to evaluate whether the Proposed Transaction is in their best interest.  Moreover, without the key financial information and related disclosures, GenVec's stockholders cannot gauge the accuracy and reliability of the financial analyses performed by Union Square and whether they can reasonably rely on its fairness opinion.

74.     Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## CLASS ACTION ALLEGATIONS

75.     Plaintiff brings this action on his own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all common stockholders of GenVec who are being and will be harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

76.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable. As of March 14, 2017, there were over 3 million shares of GenVec common stock issued and outstanding. The actual number of GenVec stockholders will be ascertained through discovery;

(b)     There are questions of law and fact that are common to the Class, including:

> i)   Whether Defendants violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction;
>
> ii)  Whether the Registration Statement omits and/or misstates material information;
>
> iii) Whether Defendants have failed to engage in a fair process and obtain the best price available for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction; and
>
> iv)  Whether Plaintiff and the other members of the Class would suffer irreparable injury if the Proposed Transaction complained of herein were

consummated.

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(d)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(e)     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, injunctive relief on behalf of the Class as a whole is appropriate.

## FIRST CAUSE OF ACTION

### Against All Defendants for Violations of Section 14(a)
### of the Exchange Act and Rule 14a-9 Promulgated Thereunder

77.     Plaintiff repeats and realleges each allegation set forth herein.

78.     As detailed herein, Defendants disseminated the false and misleading Registration Statement specified above, which contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts and which omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct earlier statements which had become false or

19

misleading, in violation of Section 14(a) of the Exchange Act and SEC Rules promulgated thereunder, including SEC Rule 14a-9.

79.     By the use of the mails and by means and instrumentalities of interstate commerce and the facility of a national securities exchange, Defendants solicited and permitted the use of their names to solicit proxies or consents or authorizations in respect of the common shares of GenVec.

80.     By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Registration Statement. The Registration Statement was prepared, reviewed, and/or disseminated by Defendants. The Registration Statement misrepresented and omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing and disseminating the Registration Statement with these materially false and misleading statements and omissions. Defendants have also failed to correct the Registration Statement and the failure to update and correct false statements is also a violation of Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

81.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding whether to vote in favor of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to shareholders.

82.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

83.     Plaintiff repeats and realleges each allegation set forth herein.

84.     The Individual Defendants acted as controlling persons of GenVec within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and directors of GenVec and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false statements and omissions contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

85.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

86.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Among other things, the Registration

Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, they were directly involved in the making of that document.

87.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Registration Statement purports to describe the various issues and information that they reviewed and considered – descriptions which had input from the Individual Defendants.

88.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

89.     Plaintiff has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in Plaintiff's favor and in favor of the Class and against Defendants as follows:

A.     Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain the best available terms for shareholders and discloses, completely and accurately, the material information concerning the Proposed Transaction presently misstated/omitted in the Registration Statement;

B.     Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.     Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the wrongdoing;

E.     Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

### **JURY DEMAND**

Plaintiff prays for a jury trial on all issues and in all proceedings so triable.

Dated: April 25, 2017                          Respectfully submitted,

                                        **BROWER PIVEN**
                                          **A Professional Corporation**

                                        */s/ Yelena Trepetin*
                                        Charles J. Piven (Md. Fed. Bar No. 00967)
                                        Email: piven@browerpiven.com
                                        Yelena Trepetin (Md. Fed. Bar No. 28706)
                                        Email: trepetin@browerpiven.com
                                        1925 Old Valley Road
                                        Stevenson, MD 21153
                                        Tel: (410) 332-0030
                                        Fax: (410) 685-1300

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
E-mail: jmonteverde@monteverdelaw.com